IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL GWYNN,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA,<br>JAMES DOUGHERTY,<br>MICHAEL DUFFY,<br>DOMINIC MANGONI,<br>PAUL MCKELVIE,<br>PAUL RALEY, and<br>THOMAS PERKS,<br><br>    Defendants. | CIVIL ACTION<br><br>No. 25-553-KSM |

<u>MEMORANDUM</u>

**MARSTON, J.**                               November 26, 2025

  Plaintiff Daniel Gwynn was granted habeas corpus relief nearly thirty years after his wrongful incarceration for the murder of Marsha Smith. The Philadelphia District Attorney's office (DAO) dropped all charges, and Gwynn, exonerated, was released from custody in 2024. Gwynn now brings a civil suit against members of the Philadelphia Police Department (PPD) and the City of Philadelphia. Defendants City of Philadelphia and Detectives James Dougherty and Dominic Mangoni move to dismiss Gwynn's claims against Detectives Dougherty and Mangoni, which allege violations of Gwynn's Fifth Amendment rights against self-incrimination, and Gwynn's *Monell* claim against the City of Philadelphia, which alleges wrongful prosecution, conviction, and incarceration. (Doc. No. 17.) Gwynn filed a brief in opposition. (Doc. No. 20.) For the reasons discussed below, Defendants' partial motion to dismiss is denied.

1

I.  **FACTUAL BACKGROUND**

Accepting all of Gwynn's allegations as true, the relevant facts are as follows. Marsha Smith, a squatter, tragically died in a fire at an abandoned apartment building on November 20, 1994. (Doc. No. 14 at ¶ 24.) No witnesses saw the person who allegedly started the fire. (*Id.* at ¶ 64.) But when detectives interviewed three witnesses who lived in the same abandoned building with Smith, two of the witnesses stated that they fought with a man named "Rick" the day before the fire. (*Id.* at ¶ 44, 49.) Although each witness gave a significantly different physical description of "Rick" (*id.* at ¶ 41), the detectives claimed that all three witnesses identified Gwynn's photo as "Rick." And the detectives fabricated a story that the witnesses recognized Gwynn from a filler picture for a photo array shown to these witnesses in a previous murder investigation. (*Id.* at ¶¶ 46–59.) The detectives represented to the prosecutor and the court that this photo array was not saved, so their story could not be verified. (*Id.* at ¶¶ 66–67.) Years later, as part of Gwynn's federal habeas corpus proceedings, the court ordered discovery which revealed the photo array did not include Gwynn's picture, leaving it unanswered why these detectives showed the witnesses Gwynn's photo. (*Id.* at ¶ 46.) Gwynn has never been called or known by the name "Rick." (*Id.* at ¶ 63.)

Following his identification by these witnesses, Gwynn was arrested in connection with the fire that killed Smith. (*Id.* at ¶ 83.) The day of his arrest, Defendants Dougherty and Mangoni coerced Gwynn into giving a false statement. (*Id.* at ¶ 83.) Seventeen hours passed between his arrest and the end of his interrogation. (*Id.* at ¶ 94.) During this time, Gwynn was handcuffed, deprived of access to an attorney, slept a total of fifteen minutes, and was under the influence of crack cocaine. (*Id.* at ¶¶ 95–96.) Defendants Dougherty and Mangoni knew Gwynn was in a drug-induced state when they interrogated him. (*Id.* at ¶ 109.) Yet, they fabricated a

false confession and forced Gwynn to sign it.[1] (*Id.* at ¶ 97.) The statement only contained details about the crime known to the police, had internal inconsistencies, and contained misunderstandings about basic facts of the crime scene. (*Id.* at ¶ 105.)

At trial, the prosecution based its case largely on the testimony of the three witnesses who identified Gwynn as the man named "Rick" and on Gwynn's coerced confession. (*Id.* at ¶¶ 110–15.) The jury convicted Gwynn of first-degree murder, arson, and five counts of aggravated assault, sentencing him to death in November 1995. (*Id.* at ¶ 116.)

Years later, post-conviction discovery revealed that the detectives ignored and deprived Gwynn of evidence that offered a credible alternative theory of guilt. (*Id.* at ¶ 31.) This alternative theory related to the murder of Glenn Taylor, who was killed in the same abandoned house as Smith just fifteen months earlier. (*Id.* at ¶¶ 117–20.) Witnesses to this murder named the attackers as Maurice Johnson, a/k/a "Reese," and Gary Lupton a/k/a "Rick." (*Id.* at ¶ 128–31.) Johnson and Lupton threatened to kill the squatters if they gave the police information about Taylor's murder. (*Id.* at ¶ 134.) Despite this threat some of the squatters provided information to the police which then led to the arrests of Johnson and Lupton. Following Johnson and Lupton's arrests, there were three arson attempts on the squatters' building, the same building where Smith had lived. (*Id.* at ¶ 143.) Significantly, two of those squatters—who later identified Gwynn as "Rick"—testified at Lupton's trial for the murder of Taylor. (*Id.* at ¶ 141.) It was just three days after these two squatters testified at Lupton's trial, that the abandoned building where the two squatters lived with Smith was burned down. (*Id.* at ¶ 142.) Moreover, a separate apartment building of another witness who testified against Taylor and

---

[1] The confession stated that Gwynn argued with the squatters in the building the day before the fire and came back the next day to apologize, but, while there, he dropped gas cans on the hallway and accidentally dropped a match that he was using to light his crack pipe. (Doc. No 14 ¶¶ 84–87.)

Lupton was also set on fire. (*Id.* at ¶ 155.) This second fire occurred after Gwynn's arrest and while he was in custody. (*Id.* at ¶ 157.)

Post-conviction discovery also revealed a letter to the police from a witness reporting that Lupton (a/k/a "Rick") solicited him to kill witnesses located in the building where Smith died. (*Id.* at ¶ 160.) And, post-conviction discovery showed that the police knew of the connection between the Taylor murder investigation and the arsons because the investigating detectives overlapped and documentation related to Taylor's murder was found in the Smith murder file. (*Id.* at ¶¶ 163–69.) But none of this exculpatory evidence was disclosed to Gwynn. (*Id.* at ¶ 162.)

According to Gwynn, the misconduct that occurred in the investigation of his case was the product of a City policy, practice, and custom of unconstitutional misconduct including:

- Engaging in unlawful interrogation of suspects; illegal witness detentions and interrogations; fabrication of witness and suspect statements; and failing to record and disclose exculpatory evidence;

- Failing to appropriately discipline or take corrective action against police officers who engaged in illegal or unconstitutional conduct;

- Failing to properly train and supervise officers on the constitutional limitations on their investigative, detention, and arrest powers;

- Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights during police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, illegal arrests, unlawful coercion of witnesses, providing unlawful fraudulent financial rewards for statements favorable to their theory of the case, falsification and fabrication of evidence, and suppression of exculpatory and impeachment evidence; and

- Failing to properly sanction or discipline PPD officers, who are aware of and conceal or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging PPD officers, including Defendants in this case, to violate the rights of citizens such as Mr. Gwynn.

(*Id.* at ¶ 217.)

Gwynn alleges the City and its policymakers knew about these practices, and in support of that allegation, references 1977 and 1978 *Philadelphia Inquirer* Pulitzer Prize-winning reports, governmental investigations, complaints, and internal PPD investigations. (*Id.* at ¶ 183.) Gwynn also names sixteen other cases with similar misconduct to show how pervasive these practices were before, during, and after his murder investigation. (*Id.* at ¶¶ 186–201.) Further, Gwynn alleges the PPD was deliberately indifferent during this time because the PPD lacked internal guidelines and rules relating to the constitutional rights of suspects and witnesses during questioning and interrogation prior to January 1, 2014. (*Id.* at ¶¶ 203–07.) After policies were instated in 2014, the PPD's clearance rate dropped, which, Gwynn claims, shows that "the PPD Homicide Unit relied on the ability to violate the constitutional rights of suspects and witnesses to investigate and clear cases." (*Id.* at ¶ 213.) The PPD still lacks policies for disclosing evidence to the DAO. (*Id.*)

## II.   LEGAL STANDARD

A plaintiff's complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" to survive a motion to dismiss under Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a motion to dismiss, a court "draws all reasonable inferences in favor of the plaintiff." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). However, we are not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted). The "presumption of truth attaches only to those allegations for which there is

sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (cleaned up). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

A plaintiff's claim for relief under Section 1983 "must allege a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States." *Morrow v. Balaski*, 719 F.3d 160, 165–66 (3d Cir. 2013). "Rather than conferring any substantive rights, section 1983 'provides a method for vindicating federal rights elsewhere conferred.'" *Hildebrand v. Allegheny County*, 757 F.3d 99, 104 (3d Cir. 2014) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).

### III. DISCUSSION

Defendants move to dismiss Gwynn's Fifth Amendment claim in Count Three and his municipal liability claim in Count Five. The Court discusses each in turn.

#### A. Fifth Amendment Claim.

In Count Three, Gwynn sues Defendants Dougherty and Mangoni under 42 U.S.C. § 1983 for violating his Fifth Amendment right against self-incrimination. (Doc. No. 14 at ¶¶ 234–38.) Specifically, Gwynn alleges that Detectives Dougherty and Mangoni fabricated a false confession and forced Gwynn to sign it while he was in a drug-induced state, overbearing Gwynn's will through sleep deprivation and aggressive interrogation. (*Id.* at ¶¶ 83–116.)

The Fifth Amendment, as applicable to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. To protect this right, the Supreme Court has provided safeguards such as *Miranda* warnings and the "right to counsel" during custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Nevertheless, "questioning a plaintiff in custody without providing *Miranda* warnings is not a basis for a § 1983 claim as long as the plaintiff's

6

statements are not used against her at trial." *Renda v. King*, 347 F.3d 550, 557–58 (3d Cir. 2003). This is because "violations of the prophylactic *Miranda* procedures do not amount to violations of the Constitution itself." *Giuffre v. Bissell*, 31 F.3d 1241, 1256 (3d Cir. 1994). Instead, to establish a Fifth Amendment claim, a plaintiff must show compulsion and use. *Roman v. DiGuglielmo*, 675 F.3d 204, 210 (3d Cir. 2012).

Here, Defendants Dougherty and Mangoni argue Gwynn's Fifth Amendment claim is not cognizable because *Miranda* violations cannot provide the basis for a § 1983 claim. (Doc. No. 17 at 6.) But here, Gwynn's Fifth Amendment claim is based not on a *Miranda* violation, but on the use of his coerced confession at trial. (Doc. No. 20 at 22–23.) The Court finds that Gwynn pleads facts, which taken as true, show compulsion and use. First, Gwynn alleges Defendants Dougherty and Mangoni coerced him into signing a false statement. (Doc. No. 14 at ¶ 235.) As alleged, Defendants Dougherty and Mangoni achieved this compulsion through seventeen hours of aggressive interrogation while Gwynn was sleep deprived, handcuffed, and under the influence of crack-cocaine. (*Id.* at ¶¶ 83–109.) *See Halsey v. Pfeiffer*, 750 F.3d 273, 306 (3d Cir. 2014) (holding the appellant's evidence of a seventeen-hour interrogation, unaccompanied by friends or counsel could show coercion). Second, Gwynn claims his compelled statement was introduced at trial, after which the jury convicted Gwynn of first-degree murder, arson, and five counts of aggravated assault. (*Id.* at ¶ 115–16.) Thus, Gwynn has alleged a cognizable Fifth Amendment claim, and Defendants' motion to dismiss Count Three is denied.

B. *Monell* **Liability**

In Count Five, Gwynn sues the City of Philadelphia, by and through its final policymakers, under § 1983 for unconstitutional practices that led to Gwynn's arrest, charging, prosecution, and nearly thirty years of wrongful incarceration. (Doc. No. 14 at ¶¶ 244–48.)

Municipalities cannot be held liable for the unconstitutional acts of their employees under

7

a theory of vicarious liability based on *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a municipality may only be held liable when an official policy, practice, or custom proximately caused the alleged constitutional deprivation. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989).[2] Courts recognize two ways a plaintiff may satisfy this standard: "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quoting *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019) (internal citations omitted). Under either theory, the complaint must give notice as to the improper conduct beyond simply alleging that the municipality's policy violated certain constitutional rights. *See McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) (finding a complaint that alleged the city had a policy of ignoring First Amendment rights was insufficient). Additionally, a plaintiff must establish proximate causation between the policy or inadequacy and the plaintiff's injury by demonstrating a "plausible nexus" or "affirmative link" between the two. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Id.* at 851.

Gwynn brings claims under both theories of municipal liability. He alleges the City had a "policy, practice, or custom" of the use of "coercive techniques in interviews and interrogations

---

[2] The Third Circuit has not decided whether a municipality can be held liable *only* when its employees violate rights that were clearly established at the time. District courts have taken different approaches. *Compare Ogrod v. City of Philadelphia*, 598 F. Supp. 3d 253, 276 (E.D. Pa. 2022) (holding the city was not subject to municipal liability for rights that were not clearly established at the time of its employees' actions), *with Crosland v. City of Philadelphia*, 676 F. Supp. 3d 364, 383 (E.D. Pa. 2023) (holding the plaintiff need not show his rights were clearly established to state a claim for municipal liability because the clearly established law analysis relates to qualified immunity, not municipal liability). Defendants' motion does not raise this issue, so the Court will not examine it further.

to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory and impeachment evidence." (Doc. No. 14 at ¶ 245.)  Gwynn also alleges his injuries were caused by the City's failure to "make any meaningful investigation into charges," its failure "to take appropriate remedial and/or disciplinary actions," and its failure to sufficiently train. (*Id.* at ¶¶ 216, 246–47.)  The Court examines each theory in turn.

### 1. Policy or Custom

"Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  The plaintiff must show the decisionmaker has "policymaking responsibility" because "[u]nder § 1983, only the conduct of those officials whose decisions constrain the discretion of subordinates constitutes the acts of the municipality." *Bielevicz*, 915 F.2d at 850.  Since Gwynn does not identify a decisionmaker with policymaking responsibility, he does not state a *Monell* claim under the policy theory.

A plaintiff alleges custom "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Andrews*, 895 F.2d at 1480.  "Custom may be established by proof of knowledge and acquiescence." *Fletcher*, 867 F.2d at 793–94.  But, "a plaintiff need not specifically identify a responsible policymaker if the plaintiff has demonstrated a custom that is so permanent and well settled as to have the force of law, such that the custom can be ascribed to municipal policymakers." *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 336 (E.D. Pa. 2017) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).

Here, Defendants argue that Count Five must be dismissed because Gwynn fails to identify a policy or custom with sufficient particularity, he cannot establish causation, and the allegations of misconduct in various lawsuits and civil complaints cannot show a practice or custom that leads to municipal liability. The Court disagrees.

First, Defendants rely on the Third Circuit's opinion in *McTernan v. City of York*, to argue Gwynn has not identified a policy or custom with sufficient particularity. (Doc. No. 17 at 9.) In *McTernan*, the court held that the complaint gave no notice as to the defendant's improper conduct because the plaintiff simply alleged that his First Amendment rights were violated. 564 F.3d at 658. Here, by contrast, Gwynn's complaint puts Defendants on notice as to their misconduct by specifically pointing to tactics used to coerce confessions, fabricate inculpatory evidence, suppress exculpatory and impeaching evidence, and manipulate statements from witnesses. (Doc. No. 14 at ¶ 180.) Gwynn's complaint identifies this custom with particularity using Gwynn's own experience and the experiences discussed in sixteen other cases. (Doc. No. 14 at ¶¶ 186–201.)

Next, Defendants claim that Gwynn fails to establish a sufficient link between the alleged pattern and the injury. (Doc. No. 17 at 12.) But Gwynn specifically alleges a causal relationship between the new procedures enacted in 2014 and the fall of the PPD's clearance rate, showing that "the PPD Homicide Unit relied on the ability to violate the constitutional rights of suspects and witnesses to investigate and clear cases." (Doc. No. 14 at ¶ 213.) At this stage, Gwynn's allegations establish a causal link that is not so "tenuous" as to warrant dismissal. *Bielevicz*, 915 F.2d at 851.

Last, Defendants argue that similar cases without findings of liability are mere allegations of misconduct, and these lawsuits and civil complaints cannot show practice or custom that

would lead to municipal liability. (Doc. No. 17 at 15.) Defendants do not cite to any controlling authority to support this argument. And they fail to recognize "courts in this circuit—including the court of appeals—have accepted similar numbers of *incidents* as evidence of a pattern." *Thomas v. City of Philadelphia*, No. CV 17-4196, 2019 WL 4039575, at *20 (E.D. Pa. Aug. 27, 2019) (emphasis added); *see also Beck v. City of Pittsburgh,* 89 F.3d 966, 969–70, 973 (3d Cir. 1996) (finding that five written *civilian complaints* of similar misconduct were sufficient to show a pattern) (emphasis added). And, while Defendants argue that civil complaints are "mere allegations," at the motion to dismiss stage, the Court must take allegations in the complaint as true. Thus, Gwynn has stated a claim for *Monell* liability under the custom theory.

Gwynn's allegations, taken as true, are sufficient to establish custom. Gwynn's allegations describe in detail a course of conduct that is widespread and long-standing. Gwynn articulates techniques used to obtain confessions; to fabricate inculpatory evidence; to withhold exculpatory and impeaching evidence by not disclosing the entire investigative file to the DAO; and to fabricate incriminating statements from witnesses, suspects, and arrestees by feeding details know by the police. (Doc. No. 14 at ¶ 180.) Gwynn alleges these practices were pervasive and known by the City, referencing reports by the *Philadelphia Inquirer*, governmental investigations, complaints, internal investigations, and sixteen similar cases. (*Id.* at ¶¶ 183–201.)

### 2. Failure or Inadequacy

A plaintiff may also hold a municipality liable for the failure to train, failure to supervise, or failure to discipline its officers. *Forrest*, 930 F.3d at 105. Under this theory, the plaintiff must show that the failure or inadequacy constituted deliberate indifference. *Id.* at 105–06. "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause

deprivation of constitutional rights." *Id.* (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). A "plaintiff need not establish that the municipal policymaker had actual knowledge of a pattern of constitutional misconduct. Constructive knowledge or a showing that the municipal policymaker 'should have known' about the pattern of constitutional misconduct is sufficient." *Thomas v. City of Philadelphia*, No. CV 17-4196, 2019 WL 4039575, at *14 (E.D. Pa. Aug. 27, 2019) (quoting *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 407 (1997))). "The proper causation inquiry in a failure to train, supervise, or discipline case focuses on 'whether the injury could have been avoided had the employee been trained [or supervised or disciplined] under a program that was not deficient in the identified respects.'" *Thomas,* 2019 WL 4039575, at *23 (quoting *Thomas v. Cumberland County*, 749 F.3d 217, 226 (3d Cir. 2014) (citing *Harris v. Canton,* 489 U.S. 378, 391 (1989))).

Gwynn's complaint alleges deliberate indifference as to the need to supervise, discipline, and train PPD officers. First, Gwynn references similar cases throughout the early 1990s to show municipal policymakers knew the PPD homicide detectives would confront difficult murder investigations where they would need to interrogate witnesses and suspects and come into possession of exculpatory and impeachment evidence that would need to be disclosed to the prosecution. Second, there was a history of mishandling murder investigations and interrogations, as alleged by reference to the *Philadelphia Inquirer* reporting in the late 1970s. Last, wrong choices by the PPD during murder investigations implicate constitutional rights under the Fourth, Fifth, and Fourteenth Amendments. Gwynn pleads with particularity the inadequacies of the disciplinary, supervision, and training systems, alleging they were arbitrary, delayed, inconsistent, incomplete, and lacked early warning systems. (Doc. No. 14 at ¶¶ 216–17.) *See Thomas v. City of Philadelphia*, 290 F.Supp.3d 371 (E.D. Pa. 2018) (holding the

plaintiff stated a *Monell* claim by recounting "nine similar incidents of police misconduct in Philadelphia from 1988 to 1994" caused by the City's failure to train and discipline detectives).

And, Gwynn has alleged causation for his failure or inadequacy theory of *Monell* liability. Gwynn identifies the "specific policies" that "would have prevented the plaintiff's alleged injuries," using his reference to the new procedures enacted in 2014, such as prohibitions on use of force, threats, coercion, and interrogation before the issuance of *Miranda* warnings. *See Thomas*, 2019 WL 4039575, at *23 (finding the plaintiff sufficiently identified policies that would have prevented his injuries, such as training officers to include exculpatory information in probable cause affidavits and prohibiting the use of force during interrogations). Further, Gwynn alleges that if he had had the exculpatory information that was withheld, it would have "powerfully refuted the prosecution's case against him." (Doc. No. 14 at ¶ 31.)

Defendants argue that Gwynn's failure to train, supervise, and discipline claim fails because Gwynn does not specify which City policymakers acted with deliberate indifference. (Doc. No. 17 at 10.) But, "[p]ractices so permanent and well settled as to have the force of law are ascribable to municipal decisionmakers." *Bielevicz*, 915 F.2d at 850. Accordingly, a plaintiff's evidence need not specifically identify the responsible decisionmaker. *Id.* Here, Gwynn "has alleged a *Monell* time-period of 48 years" (Doc. No. 17 at 8), detailing sixteen similar instances and referencing documentation of similar misconduct by the *Philadelphia Inquirer*, governmental investigations, complaints, and internal PPD investigations. (Doc. No. 14 at ¶ 183). These allegations, which suggest decades of alleged failures to train, supervise, and discipline, are sufficient to show a practice so well settled as to have the force of law. *See Wright*, 229 F. Supp. 3d at 336–37 (holding the plaintiff's complaint, which named at least eight separate instances involving the same conduct, allowed the court to infer the unconstitutional

13

practices of the Philadelphia Police Department were so widespread they could be ascribed to municipal policymakers). Thus, Gwynn has sufficiently shown the widespread, continued failures can be ascribed to municipal policymakers.

\*    \*    \*

In sum, Gwynn has sufficiently stated a *Monell* claim against the City based on a custom and a failure to train, supervise, or defend. Accordingly, the City's motion to dismiss is also denied as to Count Five.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' partial motion to dismiss is denied. Defendants' alternative request to narrow the claim both in content and in time-period is also denied.[3]

---

[3] Because this Court has found that Gwynn's complaint was sufficiently particular to put Defendants on notice of his theories of municipal liability, the request to narrow the claim is denied. Further, Defendants do not specify which content or time-periods they believe should be excluded.

practices of the Philadelphia Police Department were so widespread they could be ascribed to municipal policymakers). Thus, Gwynn has sufficiently shown the widespread, continued failures can be ascribed to municipal policymakers.

*    *    *

In sum, Gwynn has sufficiently stated a *Monell* claim against the City based on a custom and a failure to train, supervise, or defend. Accordingly, the City's motion to dismiss is also denied as to Count Five.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' partial motion to dismiss is denied. Defendants' alternative request to narrow the claim both in content and in time-period is also denied.[3]

---

[3] Because this Court has found that Gwynn's complaint was sufficiently particular to put Defendants on notice of his theories of municipal liability, the request to narrow the claim is denied. Further, Defendants do not specify which content or time-periods they believe should be excluded.